UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA           :

   -v.-                            :        15 Cr. 219 (RJS)

NOEL CUELLO,                       :

                Defendant.         :

------------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

                                    PREET BHARARA
                                    United States Attorney
                                    Southern District of New York
                                    Attorney for the United States of America

Daniel C. Richenthal
Assistant United States Attorney
- Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA            :

     -v.-                           :      15 Cr. 219 (RJS)

NOEL CUELLO,                        :

               Defendant.           :

------------------------------------------------------------x
```

### THE GOVERNMENT'S SENTENCING MEMORANDUM

Sentencing in this matter is scheduled for next Monday, February 22, 2016, at 11:00 a.m. The Government respectfully submits this memorandum in connection with that sentencing.

### PRELIMINARY STATEMENT

For at least five years, the defendant organized and led a massive tax fraud and identity theft scheme that involving bribing a public employee, abusing the personal identifying information of countless children, and filing thousands of fraudulent tax returns. When law enforcement searched both locations of his tax business, through which he engaged in the scheme, the defendant did not stop the scheme. Rather, he directed that it continue, just with him behind the scenes.

For his crime—which financed the defendant and his girlfriend, co-defendant Luz C. Ricardo, purchasing and/or leasing multiple high-end cars, including a 2012 Mercedes-Benz—the defendant has a United States Sentencing Guidelines ("Guidelines") range of either 78 to 97 months' imprisonment, as set forth in the plea agreement in this matter, or 97 to 121 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"), in which the Probation Office recommends a sentence

of 97 months. In order to serve the purposes of sentencing, including promotion of respect for the law, protection of the public, and deterrence, the Government respectfully requests that the Court impose a sentence at the top of the applicable Guidelines range.[1]

## BACKGROUND

### A. The Defendant's Offense Conduct

Starting by at least in or about 2009, the defendant started, organized, and led a massive scheme. Relying on tax credits designed to assist the poor, the defendant purchased personal information of children—including by personally, repeatedly bribing a New York City employee—and then used and caused others to use that information to file thousands and thousands of fraudulent tax returns, for a cash fee, resulting in a loss to the public of millions of dollars. (PSR ¶¶ 22-66, 68-76.) The defendant was the undisputed leader of the scheme, recruiting co-conspirators, directing their actions, and ensuring the success and growth of the criminal enterprise. (PSR ¶ 76.)

In mid-April 2012, law enforcement searched both locations of the defendant's tax business. (PSR ¶ 42; Complaint (enclosed herewith as Exhibit ("Ex.") A) ¶ 35.)

Within days, the defendant's girlfriend, co-defendant Luz C. Ricardo, with whom the defendant lived, withdrew more than $295,000 in cash from a bank account used in the scheme, and wrote a check to the defendant's mother. (PSR ¶ 47.)

But the defendant and his girlfriend were not satisfied merely to reap hundreds of thousands of dollars in profits from their fraud. They wanted to continue the fraud. (PSR ¶ 51; Complaint ¶¶ 40-48.)

---

[1]   Pursuant to the plea agreement, the Government takes no position as to whether the Probation Office correctly applied an enhancement for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), which accounts for the difference in the Guidelines range between that set forth in the plea agreement and that set forth in the PSR.

When the following tax season commenced, in January 2013, the fraud continued, with co-defendants Jonathan Orbe and Catherine Ricart nominally in charge, but the defendant actually in charge, and Ricardo continuing to serve as his partner.  Hundreds of thousands of dollars in tax preparation fees poured into a bank account that Ricart had opened with money provided to her by Ricardo.  These fees were from the filing of tax returns by an allegedly new business—at the same location as one of the two locations of the prior business—under new signage that said "Orbe Multiservice."  (PSR ¶¶ 48, 52-53; Complaint ¶¶ 45-48.)  These tax returns fraudulently used personal information of many of the same minors on which the scheme had previously relied.  (Complaint ¶ 47(b).)

In late February 2013, Ricart attempted to withdraw $200,000 from her bank account.  (PSR ¶ 48.)  Her bank, suspicious of the source of the funds, particularly given that they were going into a personal account, refused to permit the withdrawal.  (*Id.*)  Ricart responded by providing to the bank documentation indicating that she was now a tax preparer.  (PSR ¶ 49.)  She then opened a new bank account, at a new bank, and continued the scheme using that account, under the name "Ricart Multiservice."  (PSR ¶ 50.)  None of these name changes reflected a change from illegal to legal conduct by the defendant, or the co-conspirators acting at his direction.

Law enforcement figured out that the scheme was still continuing, and searched one of the same locations again.  (PSR ¶ 51; Complaint ¶ 50.)  The search yielded, among other things, a list of minors, including their names, dates of birth, and Social Security Numbers, previously used by the tax business, both before and after it became "Orbe Multiservice" or "Ricart Multiservice."  (Complaint ¶ 50.)

As the Court knows, even after this second search, the scheme still continued. Orbe applied for and received a new Electronic Filer Identification Number ("EFIN") and Preparer Tax Identification Number ("PTIN"), incorporated an allegedly new business, "Jay's Multiservices," and opened a bank account in that name. (PSR ¶ 54.) And, once again, hundreds of thousands of dollars in tax preparation fees flowed into the account—much of which Orbe then withdrew in cash, in amounts that appeared designed to avoid the filing of a currency transaction report (commonly known as a "CTR"). (*See* PSR ¶ 55.) This pattern continued the following month, with near-daily withdrawals, until law enforcement froze the account in late March 2014.

The funds that permitted such withdrawals were direct-deposited, and were associated with the filing of returns by the allegedly new business, including on behalf of certain of the same clients whose returns the defendant's business had fraudulently prepared in the past. (PSR ¶ 54; Complaint ¶¶ 20, 24, 52-53.) 100% of the returns claimed a refund. 93% claimed the same tax credit, the Earned Income Tax Credit ("EITC"), on which the scheme had principally relied for years. (Complaint ¶ 53.)

While the Government is unaware of evidence that, after Spring 2013, the defendant remained as personally involved in the operation of the fraudulent tax business as he had been between at least 2009 and 2013, it is appears that he assisted Orbe to continue the operation of that business, which relied on many of the same clients, and was committed in the same way.

But even if one were to assume *arguendo* that the defendant had no involvement in Orbe's continued operation of the business after Spring 2013—and the inference to the contrary is strong—it matters not, because the evidence demonstrates that the defendant continued to perpetrate the fraud elsewhere, just on am apparently smaller scale, and in a manner more

4

difficult to detect.  The defendant's tax business prepared returns for a certain individual ("CC-1") in tax years 2009, 2010, 2011, and 2012.  In early February 2014, CC-1 obtained a PTIN.  That PTIN was used to file nearly 300 tax returns in the following months.  98% of these returns claimed a refund.  76% claimed the EITC.  Of these returns, at least 41 were filed via Internet Protocol addresses associated with the defendant's hair salon in the Bronx (PSR ¶ 129).  There is no legitimate reason for a hair salon to file dozens of tax returns in a single tax season.  And during the same time period, tens of thousands of dollars in cash were deposited into a business bank account of the salon for which the defendant, and, starting in late March 2014, also his girlfriend, were the sole signatories, which account was used to pay personal expenses.  (Selected Bank Records (enclosed herewith as Ex. B).)  It is thus unsurprising that the defendant admitted participating in the fraud "until 2014" during his plea allocution.  (Plea Tr. 50:23.)

The defendant's fraud, which lasted for at least five years, financed a lifestyle that included the purchase and/or lease of multiple high-end cars, along with a boat or jet ski.  (PSR ¶¶ 141, 143; DMV Record (enclosed herewith as Ex. C).)  It also permitted him and his girlfriend to open, in the name of the defendant's mother, the hair salon through which the defendant continued the fraud.  (*See* PSR ¶¶ 129-30.)

B.     **The Defendant's Other Misconduct**

The Probation Office states:  "The defendant's clear and utter disregard for the law and for the consequences of his actions are exhibited not only in the instant offense, but in other activities as well."  (PSR p. 34.)  The Probation Office is correct.

*1)   The Failure to File Personal Tax Returns*

At the same time as when the defendant was engaged in the lucrative fraud (and, according to the defendant, also working lawfully (PSR ¶¶ 111, 129-30)), the defendant failed to file a single personal tax return (PSR ¶ 148).

*2)   The Scheme To File Entirely False Tax Returns*

The principal scheme in which the defendant engaged is that described above and in greater detail in the Complaint: the filing of tax returns that fraudulently claimed one or more tax credits, in return for a cash fee from those on whose behalf the returns were filed.  But this was not the only scheme in which the defendant engaged through his tax business.  With co-conspirators, the defendant also filed entirely false tax returns, using stolen personal information of adults, pretending to be those adults, which returns were designed to generate the mailing of refund checks.  The defendant and his co-conspirators then stole the refund checks from mailboxes and cashed them.  (PSR ¶ 67; Complaint ¶¶ 18(i), 19(e).)  Like the defendant's principal scheme, this scheme also lasted for years.  (PSR ¶ 67.)

*3)   The Scheme to Defraud Immigration Authorities*

The defendant married a certain woman in a civil ceremony in 2010 or 2011, and then sponsored her for legal residency, but never lived with or appears to have had an actual relationship with her, and then separated from her, without filing for divorce.  (PSR ¶ 109.)  The Probation Office describes this marriage as an apparent sham.  (*See* PSR p. 34.)

*4)   The Scheme To Obtain Fraudulently a New Jersey Driver's License*

In August 2013, the defendant's New York driver's license was suspended.  The defendant then applied for and received a New Jersey's driver's license, falsely claiming that his

6

New York license was not suspended and that he lived in New Jersey. (PSR ¶ 128; NJ License Records (enclosed herewith as Ex. D).)[2]

5) *The Scheme To Defraud Medicaid*

In September 2013, the defendant applied for Medicaid. In his application, he falsely claimed that he was not working, made no money, and lived with his mother. (PSR ¶ 71; HRA Records (enclosed herewith as Ex. E).) The defendant subsequently renewed his fraudulent receipt of Medicaid, with the apparent assistance of his mother. (Ex. E.)

6) *The Unlawful Possession of a Firearm*

The defendant does not have a license to possess a firearm. A certain cooperating witness (the "CW") informed the Government that the defendant illegally purchased a firearm from another individual, and the defendant also informed the CW that the defendant had purchased other firearms. A search of one of the computers seized from the defendant's tax business in Spring 2013 yielded photographs of a semiautomatic pistol, identified by the Bureau of Alcohol, Tobacco, Firearms and Explosives as a .380 caliber Taurus. (Ex. F.) The same computer contained a video in which the defendant appears to hand the gun to his minor children to play with, advising one of them, "Don't drop it." (Ex. G.)[3]

---

[2] Upon learning of the foregoing, the Probation Office directed the defendant to apply for a New York driver's license. (PSR ¶ 128.) The Government is not aware of whether the defendant has done so.

[3] Exhibit G is screenshots taken from this video, redacted to protect the minors' privacy. Under separate cover, the Government will transmit the video clip itself to the Court.

7

### C. The Defendant's Prior Criminal History

The defendant has been arrested five times prior to his arrest in this case, and convicted once.[4]

In July 2006, the defendant refused to leave a location, and resisted arrest. (Ex. H.)

In October 2006, the defendant again resisted arrest. (Ex. I.)

In June 2009, the defendant was found to be operating a bar without a liquor license. (Ex. J.)

In October 2009, at the same location, the defendant was again found to be operating a bar without a liquor license. (Ex. K.) He pleaded guilty to disorderly conduct. (PSR ¶ 98.)

In February 2013, the defendant was arrested for reckless endangerment, after he locked people in Orbe Multiservice. (Ex. L.)

## DISCUSSION

### A Top of the Guidelines Sentence Is Warranted

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence at the top of the applicable Guidelines range.

*First*, the nature and seriousness of the offense warrants such as sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant organized and led a massive, multiple-year fraud that used the personal information of at least hundreds of children, cost taxpayers multiple millions of dollars, and relied on abusing tax credits designed to help the poor. Crimes like that committed by the defendant do not just divert scarce public funds from where they are supposed to go, but also breed distrust of public programs generally, and programs meant for the needy in particular. And to perpetrate and expand the scope of his crime, the defendant personally and repeatedly bribed a public employee.

---

[4]     Because records of four of these arrests were sealed, only one appears in the PSR.

*Second*, the circumstances of the offense and the need for the sentence imposed to promote respect for the law warrant such a sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). As described above, and in greater detail in the Complaint, the defendant kept committing fraud even after law enforcement searched multiple locations of his tax business (and questioned his employees). He just took steps to make it more difficult to tie him to that fraud. The defendant's Guidelines range does not account for the lengthy time period in which he committed fraud, or the efforts he undertook to continue to perpetrate and conceal the fraud after law enforcement began to investigate it. The sentence imposed by this Court should.

*Third*, the history and characteristics of the defendant and the need for the sentence imposed to protect the public from further crimes of the defendant warrant such a sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(C). As discussed above, the defendant continued to engage in the fraud—and to take steps to hide what he was doing, and with whom he was doing it—after law enforcement searched his tax business. And the defendant engaged in multiple other kinds of fraud and misconduct as well. This kind of repeated conduct, separated in time, undertaken without any apparent hesitation or regret, demands a substantial sentence. The Probation Office states that the defendant "appears to pose a moderate-to-high risk of recidivism." (PSR p. 34; *see also id*. (The defendant's "overall actions over the last six years has shown little to suggest that he has any desire and/or fortitude to change his criminal mind set and lifestyle.").) The facts overwhelmingly demonstrate that that is so. Multiple arrests did not stop the defendant from committing crimes. Law enforcement searching his tax business on multiple occasions did not stop the defendant from committing crimes. The likelihood of incarceration was not sufficient.

*Finally*, the need for general deterrence strongly weighs in favor of such a sentence. *See* 18 U.S.C. § 3553(a)(2)(B). As is clear from this case, it is all too easy to do what the defendant

9

did, all too attractive, and all too difficult to detect until the fraud has reached a massive scale. This means that a meaningful sentence is warranted.  *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence at the top of the applicable Guidelines range, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
February 15, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   s/ Daniel C. Richenthal
Daniel C. Richenthal
Assistant United States Attorney
(212) 637-2109